**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LUIS VICENTE PEDROTE-SALINAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| SUPERINTENDENT EDDIE JOHNSON, | ) | JURY TRIAL DEMANDED |
| COMMANDER CHRISTOPHER KENNEDY, | ) | |
| COMMANDER ALFRED NAGODE, | ) | |
| CHICAGO POLICE OFFICER JOSEPH S | ) | |
| FITZGERALD (#19954), CHICAGO POLICE | ) | |
| OFFICER K M McLEAN (#19710), and | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Luis Vicente Pedrote-Salinas, by his undersigned attorneys, for his complaint against Superintendent Eddie Johnson, Commander Christopher J. Kennedy, Commander Alfred Nagode, Chicago Police Officer Joseph S. Fitzgerald, Chicago Police Officer K. M. McLean, and the City of Chicago, alleges as follows:

### INTRODUCTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Pedrote's rights as secured by the Fourteenth Amendment to the United States Constitution.

2.      Mr. Pedrote came to the United States from Mexico when he was five years old. Since then, he has primarily resided with his family in Chicago.

3.     Mr. Pedrote is a hard-working, family-oriented young man.  He was a student athlete who graduated from a Chicago Public High School.  While in high school, he was a member of the wrestling team, worked for his father on the weekends, and helped take care of his younger brother, all while maintaining good grades.

4.     After he graduated from high school, Mr. Pedrote began working in a factory.  His job at the factory was cut short, however, when on August 11, 2011, Immigration and Customs Enforcement's ("ICE") Homeland Security Investigations ("HSI") agents raided his home on the Southwest side of Chicago and placed him in custody.

5.     The HSI agents targeted Mr. Pedrote as part of their Community Shield Surge Operation—an operation targeting foreign born members of violent Chicago street gangs.  The agents wrongly targeted Mr. Pedrote because they received false information obtained from the Chicago Police Department's Gang Database and/or another mechanism for tracking suspected gang members indicating that Mr. Pedrote was a member of a Chicago street gang.  However, Mr. Pedrote is not, nor has he ever been, a member of a Chicago street gang.

6.     Mr. Pedrote was falsely identified as a member of a Chicago street gang by members of the Chicago Police Department ("CPD") in January 2011 because of his race, ethnicity, age, and the neighborhood he resides in.

7.     The Defendant Officers who labeled Mr. Pedrote a gang member and included his name in the Gang Database and/or another mechanism for tracking suspected gang members triggered a catastrophic chain of events and forever changed Mr. Pedrote's life.  After he was arrested by the HSI agents, he spent over six traumatic months in detention facilities until he was finally released on bond.  Since being released, Mr. Pedrote has zealously fought to stay in the United States, however, his inclusion in the Gang Database continues to haunt him.  Upon

information and belief, his application for Deferred Action for Childhood Arrivals ("DACA") was denied because of his inclusion in the CPD's Gang Database, and his request for a U Visa certification was rejected because CPD considers him to be a gang member.

8.      Mr. Pedrote's time with his family, friends, and loved ones in Chicago is dwindling—on July 20, 2017, he is scheduled to voluntarily depart the United States.  His life as he knows it is about to be destroyed, all because he was racially profiled and falsely labeled as a gang member by members of the Chicago Police Department.

9.      The CPD has failed to establish any process or procedure that enables individuals to contest their inclusion in the Gang Database.  Therefore, Mr. Pedrote will remain falsely as a gang member unless he receives relief from this Court.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a); and pendent jurisdiction for state claims as provided in 42 U.S.C. § 1367.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

12.     Plaintiff Mr. Pedrote is a 25-year-old immigrant of Mexican descent and resident of Chicago, Illinois.

13.     Defendant Eddie Johnson is the Superintendent of the Chicago Police Department.  At all times relevant to the events at issue in this case, Defendant Johnson was employed by the Chicago Police Department.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Johnson promulgated rules, regulations, polices, and procedures at the Chicago Police Department.  Defendant Johnson is

responsible for supervising all CPD officers and managing all operations at the CPD. He is sued here in his official capacity.

14. Defendant Christopher J. Kennedy is the Commander of the Gang Investigations Division and Defendant Alfred Nagode is the Deputy Chief of the Gang Enforcement Division. At all times relevant to the events at issue in this case, Defendants Kennedy and Nagode were employed by the Chicago Police Department. As such, they were acting under color of law. At all times relevant to the events at issue in this case, Defendants Kennedy and Nagode were in charge of maintaining and updating the CPD's Gang Database. They are sued here in their official and individual capacities.

15. Defendants Chicago Police Department Officers Joseph S. Fitzgerald and K. M. McLean were employees of the Chicago Police Department during the relevant time period. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Chicago Police Department. These defendants wrongfully labeled Mr. Pedrote as a Chicago street gang member and included him in the CPD's Gang Database. These defendants are sued here in their individual capacities. They are referred to collectively herein as the "Defendant Officers."

16. Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois. It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible.

**FACTUAL ALLEGATIONS**

**The Chicago Police Department Falsely Labeled Mr. Pedrote as a Gang Member and Included him in the CPD's Gang Database**

17.     The Chicago Police Department maintains a Gang Database of all suspected gang members in the City of Chicago. This Gang Database is arbitrary, over-inclusive, and contains false information. Many people are included in the Gang Database who are not in fact members of any street gang. Upon information and belief, the Chicago Police Department also uses a number of other similarly arbitrary, over-inclusive mechanisms to track and report on people who are suspected of gang membership. These other mechanisms are also riddled with false information.

18.     On January 9, 2011, Mr. Pedrote, who was nineteen years old, was spending time with family on the Southwest side of Chicago in between Brighton Park and Gage Park—a primarily Latinx neighborhood. Mr. Pedrote had just exited his cousin's family member's apartment and entered his vehicle when the Defendant Officers spotted him and pulled up behind him in the parking lot. The Defendant Officers walked up to Mr. Pedrote's driver-side window—his vehicle was still turned off—and Mr. Pedrote asked the officers what they wanted. The Defendant Officers saw an unopened can of beer in the cup holder of Mr. Pedrote's vehicle and ordered him to get out of the vehicle. The Defendant Officers proceeded to arrest Mr. Pedrote for purchase/possession of liquor as a minor and took him to the police station. Mr. Pedrote spent the night at the station and was released the next morning. The charges against him were subsequently dismissed.

19.     The Defendant Officers indicated in the police report that they were assigned to the area where they stopped Mr. Pedrote for a "gang suppression mission." They also indicated that during their arrest of Mr. Pedrote, he self-admitted to being a Latin Kings gang member.

5

This report is a fabrication—Mr. Pedrote did not admit to being a gang member.  Mr. Pedrote is not a gang member and has never been a gang member.

20.     The Defendant Officers wrongly assumed Mr. Pedrote was a gang member because he was a young Latino and the neighborhood he was stopped in is known Latin Kings territory.

21.      The Defendant Officers entered Mr. Pedrote's information into the CPD's Gang Database and/or another mechanism for tracking suspected gang members and labeled him as a Latin Kings gang member.

22.     Neither the Defendant Officers nor any other member of the CPD ever confronted Mr. Pedrote with any evidence that he was gang-affiliated before including him in the Gang Database and/or another mechanism for tracking suspected gang members, nor did they ever inform him of his inclusion in the Gang Database and/or another mechanism for tracking suspected gang members.  Mr. Pedrote also never had the opportunity to challenge his inclusion in the Gang Database and/or another mechanism for tracking suspected gang members.

**HSI Targeted Mr. Pedrote Because It Received False Information from the CPD**

23.     The U.S. Immigration and Custom's Enforcement's (ICE) Homeland Security Investigations (HSI) has an ongoing nationwide initiative called Operation Community Shield in which they target foreign born members of violent street gangs.  From August 7, 2011, to August 11, 2011, the Chicago field office of HSI conducted a Community Shield Surge Operation targeting foreign born members of the Maniac Latin Disciples violent street gang.

24.     Mr. Pedrote lived on the Southwest side of Chicago in between the Gage Park and Chicago Lawn neighborhoods, which is known Manic Latin Disciples territory.  The Manic Latin Disciples and the Latin Kings are rival gangs.

25.     On August 11, 2011, HSI Special Agents Frank Colon, Jason Johnsen, Raymond Smith, and William Dibbern raided Mr. Pedrote's home at 1:00 AM.  The agents woke up Mr. Pedrote by demanding the whereabouts of Mr. Pedrote's cousin who had moved out of state and with whom Mr. Pedrote was not in contact.

26.     The agents then proceeded to arrest Mr. Pedrote, stating that they were also looking for him.  The HSI agents believed Mr. Pedrote was a member of the Latin Kings because the Chicago Police Department falsely communicated to HSI that Mr. Pedrote was affiliated with the Latin Kings.  The fact that Mr. Pedrote did not fit the profile of a Latin Kings gang member, in part because he lived in rival gang Manic Latin Disciple territory, should have made both HSI and CPD aware that Mr. Pedrote was not a gang member.

27.     The agents' indicated in their report that they reviewed files from the CPD that documented Mr. Pedrote's alleged affiliation with the Latin Kings.  They also indicated in their report that Mr. Pedrote self-admitted to associating with members of the Latin Kings gang to two of the agents present during the arrest.  However, Mr. Pedrote never admitted to associating with the Latin Kings or to being a Latin Kings member.  He did however admit to having contact with his cousin, and upon information and belief, both HSI and CPD suspected Mr. Pedrote's cousin of being a Latin King.

28.      During this home raid, the agents also placed Mr. Pedrote's father in handcuffs; the agents eventually let Mr. Pedrote's father go.  Mr. Pedrote's mother and six-year-old brother were also in present in the home, but they stayed in a bedroom, terrified.

29.     Mr. Pedrote was not the first, nor the last person to be targeted by Immigration Customs and Enforcement because of false information ICE received from the CPD.  Upon information and belief, in the past recent months, ICE has conducted a number of raids in

primarily Latino neighborhoods in Chicago as part of Operation Community Shield. ICE agents have arrested a number of individuals during these raids who they perceived to be gang members due to false information they received from the CPD's Gang Database.

30.    On one day in March 2017, ICE agents conducted a Community Shield Operation and raided the home of a man who is partially paralyzed and used excessive force against him during the arrest, further injuring him in the process. The ICE agents targeted this man because it received false information from the CPD that he is a gang member. On that same day, ICE agents raided another home and attempted to arrest a young man who is a U.S. citizen, and ended up shooting his father in the process. ICE indicated on Twitter that this raid was a part of "a gang op." This young man also is not a gang member.

31.    Since 2006, the City of Chicago has claimed that it is a "sanctuary city" and will therefore provide all residents "equal access to the services, opportunities and protection it provides and administers." But the City of Chicago is not a sanctuary city for those individuals like Mr. Pedrote who have been falsely labeled by CPD as a gang member and then subsequently targeted by Immigration Customs and Enforcement because CPD shared this false information.

32.    Upon information and belief, gang databases disproportionately identify African American and Latino men as gang members. "Research indicates that law enforcement gang task forces often label large numbers of youth of color as gang members with little or no evidence of gang involvement. This racism is further increased by a complete refusal to recognize and address primarily white gangs." Lillian Dowdell Drakeford, *The Race Controversy in American Education* (2015), at 160. Examples of this racial bias are seen in: the Los Angeles County gang database, where approximately half of all African American men between the ages of 16 and 24 are listed as gang members or associates, *id.*; the Denver Police

Department gang database, where 2 out of every 3 African American males in Denver were listed as a gang member and 1 out of every 4 Latinos, Julie Barrows & C. Ronald Huff, *Gang & Public Policy: Constructing and Deconstructing Gang Databases*, 8 CRIMINOLOGY & PUB. POL'Y 675, 683 (2009); and the Minnesota gang database, which is 44 percent African American and 36 percent white, K. Babe Howell, *Fear Itself: The Impact of Allegations of Gang Affiliation on Pre-trial Detention*, 23 ST. THOMAS L. REV. 620 (2011). "The vague criteria, secrecy of the process, and lack of judicial review create a danger that police officers add many young, minority males to the database simply because they wear hip-hop clothing and live in poverty-stricken, high-crime areas." Linda S. Beres & Thomas D. Griffith, *Demonizing Youth*, 34 LOY. L.A. L. REV. 747, 761 (2001).

33. City of Chicago officials know that the CPD's Gang Database is rife with inaccuracies and that many individuals included in the database have no gang affiliation. City of Chicago officials know that when this false information is provided to ICE it will be used against individuals in removal proceedings and that individuals have no recourse to challenge their inclusion in the database.

**Mr. Pedrote Spent Six Traumatic Months in Detention Facilities**

34. After the HSI agents arrested Mr. Pedrote and placed him in custody, Mr. Pedrote was transported to McHenry County Adult Correctional Facility, which has a contract with ICE to hold immigration detainees pending the resolution of their removal cases. Mr. Pedrote spent about a week and a half at McHenry County Adult Correctional Facility.

35. Mr. Pedrote was then transferred to Rolling Plains Correctional Facility in Texas where he spent about six months—this detention facility also has a contract with ICE to hold immigration detainees.

36.     While detained in both McHenry County Adult Correctional Facility and in Rolling Plains Correctional Facility, Mr. Pedrote was housed with adults detained on serious criminal violations.  Being housed in those detention centers was a truly terrifying experience for Mr. Pedrote—he was constantly harassed by other detainees and had to watch out for detainees who wanted to fight him because of his race and ethnicity.

37.     Mr. Pedrote did not receive adequate medical care in Rolling Plains Correctional Facility.  While there, he developed a serious infection between his groin and leg, and he did not receive treatment for that infection for about three weeks, despite consistently putting in requests for medical treatment.

38.     While in Rolling Plains Correctional Facility, he was locked in his cell for 22 hours a day; he was only let out of his cell for two one-hour recess sessions each day.  And because it was too expensive to make phone calls, he could only call home about once a week.  Mr. Pedrote felt alone, scared, and helpless inside the detention facilities.

39.     After about six months, Mr. Pedrote was finally released on bond and he traveled back to Chicago to live with his family.

**Mr. Pedrote's Inclusion in the Gang Database Continues to Have Detrimental Effects on his Efforts to Remain in the United States**

40.     After Mr. Pedrote was released, he was determined to find employment and continue being a productive member of society.  As soon as Mr. Pedrote returned to Chicago, he started working at Subway.  He worked at Subway for three years and then transitioned to working in the sales and marketing field.  Mr. Pedrote now works three jobs in this industry.  He is working hard and establishing himself in his career.  In addition to work, he is an active member of his church.

41. After he was released on bond, Mr. Pedrote continued to fight his immigration case from Chicago. On December 15, 2014, Mr. Pedrote filed an application for Deferred Action for Childhood Arrivals ("DACA"). DACA is an immigration policy started by the Obama administration that allows certain undocumented individuals who entered the United States as minors to receive a renewable two-year period of deferred action from deportation. Mr. Pedrote meets all of the requirements to receive DACA—he came to the United States before the age of sixteen; he is under the age of 31; he has continuously resided in the United States since June 15, 2007; he graduated from high school; and he has not been convicted of any criminal offense and does not otherwise pose a threat to national security or public safety.

42. Despite meeting all the requirements, U.S. Citizenship and Immigration Services ("USCIS") denied Mr. Pedrote's DACA application on October 29, 2015. USCIS claimed that Mr. Pedrote had not demonstrated that he warranted a favorable exercise of prosecutorial discretion and therefore it refused to defer action in his matter. USCIS did not provide any further explanation for why Mr. Pedrote did not warrant a favorable exercise of prosecutorial discretion.

43. Upon information and belief, USCIS denied Mr. Pedrote's DACA application because he is in the CPD's Gang Database. USCIS believes Mr. Pedrote is a gang member and as such, he would pose a threat to national security or public safety and thus does not warrant a favorable exercise of prosecutorial discretion.

44. If CPD had not labeled Mr. Pedrote a gang member and included him in its Gang Database, his application for DACA likely would have been granted and he would have received deferred action from deportation.

45.     Mr. Pedrote also applied for a U Visa certification with the CPD on February 18, 2016, to be used with his petition for a U Visa.  A U Visa is a nonimmigrant visa for victims of certain crimes who have been, or are likely to be, helpful to law enforcement in the investigation or prosecution of a crime.  USCIS's decision to grant a U Visa petition is discretionary and it may consider any evidence that law enforcement and immigration authorities possess when determining whether to grant a U Visa.  The petition for a U Visa must also contain a U Visa certification from a certifying law enforcement agency confirming that that the petitioner has been helpful or is likely to be helpful in the investigation or prosecution of the crime.

46.     Mr. Pedrote is eligible to apply for a U Visa because he was the victim of a crime while working at a Subway restaurant located on the Southwest side of Chicago on June 9, 2012. On that day, Mr. Pedrote was working in the restaurant with two other employees when a man came into the restaurant with a semi-automatic pistol and stole money out of the cash register. Mr. Pedrote was fully cooperative with the CPD.

47.     Despite Mr. Pedrote being the victim of an armed robbery and being fully helpful in the investigation of the crime, the CPD denied his U Visa certification on September 8, 2016. The CPD claimed that Mr. Pedrote was not a victim of the armed robbery; instead, they considered him to be a witness.  According to CPD, the victim of the armed robbery was the physical Subway restaurant.

48.     Through counsel, Mr. Pedrote asked the CPD to reconsider its denial of his U Visa certification, explaining that it is illogical to consider Subway as the victim of the armed robbery when it was the employees who had a gun pointed at them who were the real victims. The CPD never responded to Mr. Pedrote's request to reconsider its denial of his U Visa certification.

49.     Upon information and belief, the CPD refused to grant Mr. Pedrote's U Visa certification because it considers him to be a gang member.  If Mr. Pedrote had not been included in CPD's Gang Database, it is likely that CPD would have approved his U Visa certification.

50.     If Mr. Pedrote had received his U Visa certification, he would have been able to apply for a U Visa with USCIS.  If granted, the U Visa would have allowed Mr. Pedrote to remain in the United States.

51.     With the denial of his DACA application and his U Visa certification, as well as his continued inclusion in the CPD Gang Database, Mr. Pedrote was left with zero options to fight his removal case and now faces imminent deportation.  Mr. Pedrote is scheduled to voluntarily depart the United States on July 20, 2017.

52.     On July 20, 2017, Mr. Pedrote's whole world will be turned upside down.  He will be forced to leave behind his family and friends, his career, and all the opportunities available to him in the states, and return to a country that he has not been to since he was five years old and does not remember.

## COUNT I – DENIAL OF DUE PROCESS
### (Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983 Against Defendant Superintendent Johnson)

53.     Mr. Pedrote repeats and realleges the preceding paragraphs as if fully set forth in this Count.

54.     Count I is alleged against Defendant Superintendent Eddie Johnson in his official capacity.

55.     The Chicago Police Department maintains a Gang Database consisting of the names and identifying information of individuals who are suspected to be members of street gangs.

56.     The Defendant Officers falsely labeled Mr. Pedrote as a member of a Chicago street gang and included his identifying information in the CPD's Gang Database without justification.

57.     Mr. Pedrote is not and has never been a member of a Chicago street gang.

58.     Mr. Pedrote was never notified by CPD that he was in the Gang Database. CPD never confronted him with evidence that he was gang-affiliated before including him in the Gang Database. There is no procedure by which Mr. Pedrote can contest his inclusion in the Gang Database.

59.     Upon information and belief, the CPD shares information contained in the Gang Database with ICE. Through this information sharing, ICE's HSI obtained Mr. Pedrote's name and address and subsequently arrested Mr. Pedrote, in part, because CPD falsely informed HSI that Mr. Pedrote is a gang member.

60.     If CPD had not included Mr. Pedrote's name in the Gang Database, Mr. Pedrote would not have been targeted and prioritized by HSI as part of Operation Community Shield and he would not now be in deportation proceedings.

61.     If CPD had not included Mr. Pedrote's name in the Gang Database, Mr. Pedrote's application for DACA likely would have been granted and he would have received deferred action and been allowed to remain in the United States.

62.     If CPD had not included Mr. Pedrote's name in the Gang Database, CPD likely would have granted his U Visa certification and he would have then been able to apply for a U Visa.  If granted, the U Visa would allow Mr. Pedrote to remain in the United States.

63.     Mr. Pedrote's liberty has been deprived based on false evidence used against him that he could not challenge.

64.     By falsely labeling Mr. Pedrote as a Chicago street gang member, including his name in the Gang Database, and then sharing his identifying information with HSI and USCIS—while knowing that HSI would target Mr. Pedrote and use this evidence against Mr. Pedrote in removal proceedings, and that this evidence would adversely affect any form of relief Mr. Pedrote might seek such as DACA or a U Visa—the CPD violated Mr. Pedrote's Fourteenth Amendment due process right.

65.     The CPD's dissemination of false information regarding Mr. Pedrote's gang membership without the precaution of reasonable efforts to guarantee the accuracy of the information restricted Mr. Pedrote's liberty without any procedural safeguards designed to prevent such inaccuracies in violation of his constitutional rights.

66.     Mr. Pedrote seeks injunctive and declaratory relief against Defendant Superintendent Johnson in his official capacity to prevent the continued violation of his constitutional rights.

**COUNT II – DENIAL OF DUE PROCESS**
**(Fourteenth Amendment Claim for Damages under 42 U.S.C. § 1983 Against Defendants**
**Superintendent Johnson, Commander Kennedy, Commander Nagode, Officer Fitzgerald,**
**and Officer McLean)**

67.     Mr. Pedrote repeats and realleges the preceding paragraphs as if fully set forth in this Count.

68.     Count II is alleged against Defendants Superintendent Eddie Johnson, Commander Christopher J. Kennedy, Commander Alfred Nagode, Officer Joseph S. Fitzgerald, and Officer K. M. McLean.

69.     As explained in detail above, the Chicago Police Department maintains a Gang Database consisting of the names and identifying information of individuals who are suspected to be members of street gangs.

70.     Defendants Commander Kennedy and Commander Nagode are in charge of the divisions of CPD responsible for maintaining, monitoring, and updating the Gang Database.

71.     Defendants Officer Fitzgerald and Officer McLean falsely labeled Mr. Pedrote as a member of a Chicago street gang and included his identifying information in the CPD's Gang Database without justification.

72.     Mr. Pedrote is not and has never been a member of a Chicago street gang.

73.     As explained in detail in Count I, the CPD violated Mr. Pedrote's Fourteenth Amendment due process rights by including him in the Gang Database without affording him any due process protections, and by sharing that false information with HSI and USCIS while knowing that the false information that Mr. Pedrote could not challenge would deprive Mr. Pedrote of his liberty.

74.     As a result of the unjustified and unconstitutional conduct of the CPD, Mr. Pedrote suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, emotional distress, and attorneys' fees.

## COUNT III – FAILURE TO INTERVENE
### (Fourteenth Amendment Claim for Damages under 42 U.S.C. § 1983 Against the Defendant Officers)

75.     Mr. Pedrote repeats and realleges the preceding paragraphs as if fully set forth in this Count.

76.     Count III is alleged against Defendants Officers Fitzgerald and McLean.

77.     During the events described above, the individual Defendant Officers stood by without intervening to prevent the violation of Mr. Pedrote's constitutional rights under the Fourteenth Amendment, even though they had the opportunity and duty to do so.

78.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Mr. Pedrote's clearly established constitutional rights.

79.     As a direct and proximate result of the Defendants' failure to intervene, Mr. Pedrote suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, emotional distress, and attorneys' fees.

## COUNT IV – UNLAWFUL POLICY AND PRACTICE
### (*Monell* Claim for Damages under 42 U.S.C. § 1983 Against the City of Chicago)

80.     Mr. Pedrote repeats and realleges the preceding paragraphs as if fully set forth in this Count.

81.     Count IV is alleged against Defendant City of Chicago.

82.     The actions of the individual Defendants were undertaken pursuant to policies and practices of the Chicago Police Department, described above and below, which were ratified by policymakers for the City of Chicago with final policymaking authority.

83.     At all times material to this complaint, Defendant City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council had interrelated *de facto* policies, practices, and customs which included, inter alia:

a.  maintaining a Gang Database consisting of names and identifying information of individuals suspected of being members of Chicago street gangs;

b.  including individuals in the Gang Database and labeling them as gang members without any justification or evidence proving that they were in fact members of street gangs;

c.  failing to inform individuals when their information is inputted into the Gang Database;

d.  failing to have a process by which individuals can challenge their inclusion in the Gang Database;

e.  failing to have any sort of process by which the information contained in the Gang Database is analyzed for accuracy;

f.  communicating information contained in the Gang Database with ICE and USCIS.

84.     The interrelated policies, practices, and customs alleged above were or should have been well-known within the Chicago Police Department, both before and after Mr. Pedrote's inclusion in the Gang Database and subsequent arrest by ICE's HSI.

85.     During the past recent months, a number of individuals have been arrested by ICE based on false information ICE obtained from the CPD regarding the individual's alleged involvement in street gangs.  These individuals were not gang members and never had an opportunity to challenge their inclusion in the CPD's Gang Database.

86.     Upon information and belief, ICE is using false information that individuals are Chicago street gang members against the individuals in removal proceedings, including at bond hearings.

87.     Upon information and belief, USCIS is using false information that individuals are Chicago street gang members against the individuals when considering DACA applications.

88.     The interrelated policies, practices, and customs alleged above were the direct and proximate cause of the unconstitutional acts committed by the CPD Defendants and the injuries suffered by Mr. Pedrote.

### COUNT V – ILLINOIS CIVIL RIGHTS ACT ("ICRA")
### (ICRA Claim for Damages Against Defendant City of Chicago)

89.     Mr. Pedrote repeats and realleges the preceding paragraphs as if fully set forth in this Count.

90.     Count V is alleged against the City of Chicago.

91.     The Illinois Civil Rights Act states, in relevant part, that no unit of State, county, or local government shall "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2).

92.      The City of Chicago, through the actions of the individual Defendants, caused and perpetuate unlawful discrimination against black and Latino men.

93.     The Chicago Police Department has a policy and practice of including black and Latino men who have not participated in any gang activity in the Gang Database for no justifiable reason other than their race and national origin.

94.     Mr. Pedrote is not a Chicago street gang member and the Defendants only labeled him as a gang member and included his information in the Gang Database because of his race and ethnicity.  The Defendants treated Mr. Pedrote differently because of his race and national origin in violation of ICRA.

95.     As a result of the Defendants' actions, Mr. Pedrote suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, pain, fear, and emotional distress.

## COUNT VI – INDEMNIFICATION
### (State Law Claim Against the City of Chicago)

96.     Mr. Pedrote repeats and realleges the preceding paragraphs as if fully set forth in this Count.

97.     Count VI is alleged against Defendant City of Chicago.

98.     Illinois law provides that public entities are directed to pay ant tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

99.     The individual Defendants are or were employees of Defendant City of Chicago who acted within the scope of their employment in committing the misconduct described above.

100.     Defendants City of Chicago are thus liable under the theory of indemnification.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Luis Vicente Pedrote-Salinas requests that this Court enter judgment in his favor against Defendants in the following manner:

1.      Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Mr. Pedrote under the Fourteenth Amendments to the United States Constitution.

2.      Enjoin the Defendants from subjecting Mr. Pedrote to the unlawful policies, practices, and conduct described in this Complaint.

3.      Retain jurisdiction of this case until such time as the Defendants have fully complied with all orders of the Court, and there is reasonable assurance that the Defendants will continue to comply in the future with these orders.

4.      Award Mr. Pedrote compensatory and punitive damages.

5.      Award Mr. Pedrote reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

6.      Award Mr. Pedrote such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: July 11, 2017

Respectfully submitted,

**LUIS VICENTE PEDROTE-SALINAS**

By: /s/ Vanessa del Valle
      One of his attorneys

Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue

Chicago, IL 60611
(312) 503-1271
sheila.bedi@law.northwestern.edu
vanessa.delvalle@law.northwestern.edu

Brendan Shiller
Chris Bergin
Tia Haywood
Shiller Preyar LLC
601 S. California Avenue
Chicago, IL 60612
brendan@shillerpreyar.com
chris@shillerpreyar.com
thaywood@shillerpreyar.com