# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LUIS VICENTE PEDROTE-SALINAS, ) ) Plaintiff, ) ) v. ) ) SUPERINTENDENT EDDIE JOHNSON, ) COMMANDER CHRISTOPHER KENNEDY, ) COMMANDER ALFRED NAGODE, ) CHICAGO POLICE OFFICER JOSEPH S. ) FITZGERALD (#19954), CHICAGO POLICE ) OFFICER K. M. McLEAN (#19710), and ) CITY OF CHICAGO, ) ) Defendants. ) | Case No. 17 C 5093 Judge Joan H. Lefkow |

## OPINION AND ORDER

Luis Vicente Pedrote-Salinas (Pedrote) has sued Chicago Police Superintendent Eddie Johnson and certain commanders and officers of the Chicago Police Department (CPD) for violation of his civil rights protected by 42 U.S.C. § 1983. Defendants have moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 31.) For the reasons stated below, the defendants' motion to dismiss is granted.[1]

## BACKGROUND[2]

Pedrote came to the United States from Mexico when he was five years old and has primarily resided with his family in Chicago since that time. During high school, Pedrote maintained good grades, was a member of the wrestling team, worked for his father on the

---

[1] The court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), and 1367. Venue is proper under 28 U.S.C. § 1391(b).

[2] Unless otherwise noted, the following facts are taken from plaintiff's complaint and are presumed true for the purpose of resolving the pending motion. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

weekends, and helped take care of his younger brother. After graduating from a Chicago public high school, he got a job working at a factory.

Although he is not and has never been a member of a gang, in January 2011, Officers Fitzgerald and McLean (the Defendant Officers) placed Pedrote in a "gang database" maintained by the CPD and overseen by Commanders Kennedy and Nagode. Pedrote was placed in the database after the Defendant Officers arrested him in a primarily Latino neighborhood on the Southwest side of Chicago while out on a "gang suppression mission." They observed an unopened can of beer in the cup holder of Pedrote's car, which was illegal for a minor to possess. In their police report, the Defendant Officers wrote that Pedrote self-admitted to being a Latin King gang member. Pedrote maintains that this information was fabricated. (In fact, he resides in rival gang Manic Latin Disciples' territory.) The charges of purchase/possession of liquor as a minor against Pedrote were dismissed, but neither the Defendant Officers nor any member of CPD informed Pedrote that his name had been put in the gang database. Even had he known, there was no means for him to challenge placement in the database. Pedrote maintains that the gang database is arbitrary, over-inclusive, and riddled with false information and that it disproportionately identifies African-American and Latino men as gang members.

U.S. Immigration and Customs Enforcement (ICE) agents then raided Pedrote's home on August 11, 2011, as part of a nationwide initiative designed to target foreign-born members of violent street gangs, and took him into custody. The agents indicated in their report that they had reviewed files from CPD that documented Pedrote's alleged affiliation with the Latin Kings. Pedrote spent approximately six months in immigration detention centers until he was released on bond. Pedrote maintains that his case is not an isolated incident and that other undocumented

immigrants in Chicago have been prioritized for deportation based on CPD's sharing of erroneous gang labels.

After his release, Pedrote returned to Chicago where he worked at a Subway sandwich shop for three years and later in sales and marketing. During that time, Pedrote filed an application for Deferred Action for Childhood Arrivals (DACA). DACA allows certain undocumented individuals who entered the United States as minors to receive a renewable two-year deferred action from deportation. Pedrote maintains that he meets all criteria necessary to request DACA[3]: He came to the United States before the age of sixteen; he is under the age of 30; he has continuously resided in the United States since June 15, 2007; he graduated from high school; and he has not been convicted of any criminal offense nor does he otherwise pose a threat to national security or public safety. Pedrote submitted his application on December 15, 2014, but on October 29, 2015, U.S. Citizenship and Immigration Services (USCIS) denied the application, indicating only that Pedrote had not demonstrated that he warranted a favorable exercise of prosecutorial discretion and therefore USCIS would not defer action on his case.

On February 18, 2016 Pedrote applied to CPD for a certification to be used with his petition for a U Visa. A U Visa is a nonimmigrant visa for victims of certain crimes who have been, or are likely to be, helpful to law enforcement in the investigation or prosecution of a crime. USCIS's decision to grant a U Visa petition is discretionary and it may consider any

---

[3] In June 2012, the Obama Administration created DACA. The contours of the program were set out in a June 15, 2012 memorandum from former Secretary of Homeland Security Janet Napolitano (the "Napolitano Memo"). The Napolitano Memo listed five criteria that should be satisfied before an individual is considered for an exercise of prosecutorial discretion: (1) came to the United States under the age of sixteen; (2) has continually resided in the United States for at least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum; (3) is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and (5) is not above the age of thirty.

evidence that law enforcement and immigration authorities possess when determining whether to grant a U Visa. The petition for a U Visa must contain a "U Visa certification" from a certifying law enforcement agency confirming that the petitioner has been helpful or is likely to be helpful in the investigation or prosecution of a crime. Pedrote maintains that he is eligible for a U Visa based on an incident that happened while he was working at Subway. On June 9, 2012, a man entered the Subway with a semi-automatic pistol and stole money out of the cash register. Pedrote was fully cooperative with CPD in the investigation. On September 8, 2016, however, CPD declined to issue Pedrote a U Visa certification. CPD indicated that Pedrote was not a victim of the armed robbery but, rather, a witness, the victim being Subway. Given the denial of both his DACA application and U Visa certification, Pedrote now faces imminent deportation.

In count I, Pedrote seeks injunctive relief against Superintendent Johnson for including him in its gang database without procedural protections and for sharing that information with ICE in violation of his due process rights. In count II, Pedrote seeks damages from Superintendent Eddie Johnson, Commander Christopher J. Kennedy, Commander Alfred Nagode, Officer Joseph S. Fitzgerald, and Officer K. M. McLean, for the same due process violation. In count III, Pedrote alleges that the Defendant Officers failed to intervene to protect Pedrote's rights. In count IV, Pedrote alleges a *Monell* claim against the City for their policy of allegedly maintaining an overinclusive gang database full of errors and sharing that information with immigration authorities without any procedural protections. In count V, Pedrote alleges that the City has unlawfully discriminated against black and Latino men, in violation of the Illinois Civil Rights Act (ICRA), 740 ILCS 23/5(a)(2). Finally, in count VI Pedrote alleges a state law claim for indemnification against the City.

**LEGAL STANDARD**

In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *see also Johnson* v. *City of Shelby*, --- U.S. ---, 135 S. Ct. 346, 346 (2014) (per curiam) ("Federal pleading rules call for a short and plain statement of the claim showing the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").[4]

**ANALYSIS**

**I.   Statute of Limitations**

As a preliminary matter, defendants argue that Pedrote's claims are barred because they fall outside the two-year statute of limitations period. Pedrote counters that the continuing violation doctrine saves his claims.

---

[4] The standard for evaluating a motion to dismiss under Rule 12(b)(1) is the same as under Rule 12(b)(6): "In considering a motion to dismiss for lack of subject matter jurisdiction, the district court must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *Transit Exp., Inc.* v. *Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001).

Generally, a civil rights claim accrues when the plaintiff knows or has reason to know of the injury giving rise to his claim. *Wilson* v. *Giesen*, 956 F.2d 738, 740 (7th Cir. 1992). However, "when the violation of the plaintiff's constitutional rights is a continuing one, the statute of limitations does not start to run *any earlier* than the last day of the ongoing injury." *Devbrow* v. *Kalu*, 705 F.3d 765, 770 (7th Cir. 2013) (citing *Heard* v. *Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)). To determine the date of accrual of § 1983 claims, the court should first identify the injury of which the plaintiff complains and then determine when the plaintiff could have filed suit for that injury. *Hileman* v. *Maze*, 367 F.3d 694, 696 (7th Cir. 2004). "That date should coincide with the date the plaintiff 'knows or should know' that [his] rights were violated. *Id.*

Pedrote argues he was injured when the defendants wrongfully included him in the gang database and then shared his false gang designation with ICE. This led to ICE's targeting Pedrote for removal and placing him in deportation proceedings in 2011 and later to the denial of his DACA and U Visa certification applications. The continuing violation doctrine would not apply to delay the start of the limitations period because "discrete acts" that merely have "lingering consequences" do not amount to continuing violations.[5] *Savory* v. *Lyons*, 469 F.3d 667, 673 (7th Cir. 2006); *see also Dasgupta* v. *Univ. of Wis. Bd. or Regents*, 121 F.3d 1138, 1140 (7th Cir. 1997) (holding that a university's alleged discriminatory acts occurring outside the limitations period were not continuing violations under Title VII and reasoning that there "were not new violations during the limitations period, but merely a refusal to rectify the consequences of time-barred violations"); *Brevot* v. *New York City Dep't of Educ.*, 299 F. App'x 19, 20 (2d Cir. 2008)

---

[5] Although Pedrote argues that his false gang designation was repeatedly shared with ICE, there is no such allegation in the complaint.

("a stigma-plus claim has accrued even if some of the consequences of the stigmatizing allegations are potential and contingent").

Even so, the statute did not begin to run until Pedrote knew or should have known that the false information had been shared with ICE. Defendants contend that Pedrote had reason to know of his alleged injury in 2011 because "(1) in January 2011 he was arrested and the police report was generated, and (2) in August 2011, federal immigration agents arrested him based on the information in the report." (Dkt. 32 at 4.) These generalizations do not, however, lead to the conclusion defendants draw. Pedrote was arrested in January 2011 for purchase/possession of liquor as a minor. Even if he had access to the police report showing a gang affiliation, he had no reason to know that the information was to be shared with ICE. Although ICE agents raided Pedrote's home in August 2011, the complaint does not speak to whether Pedrote learned or reasonably could have learned that defendants had conveyed the false gang designation to ICE.

The court is unable to discern from the allegations in the complaint when Pedrote learned he was in the gang database, when he learned the false information was given to ICE, or when he learned that ICE targeted him for removal because of the false gang designation. Pedrote "is not required to negate an affirmative defense, such as the statute of limitations in his complaint[,] [a]nd though a plaintiff can plead himself out of court if he alleges facts that affirmatively show his suit is time-barred, that is not what we have here." *Clark* v. *City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003). At this stage, "the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations, and that possibility exists." *Id.* at 768. If, for example, Pedrote did not learn that the false information had been conveyed to ICE until his DACA application was denied in October 2015, his suit filed in July 2017 would fall

7

within the two-year limitations period. Pedrote's claims thus survive any statute of limitations challenge.

## II.  Section 1252(g) of the Immigration and Nationality Act, 8 U.S.C. § 1252(g)

Defendants raise a second threshold issue—that Pedrote's due process claims are barred because the court lacks jurisdiction under 8 U.S.C. § 1252(g). Under section 1252 (Judicial Review of Orders of Removal) of the Immigration and Nationality Act (INA), "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien *arising from* the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." (emphasis added).

To determine whether Pedrote's due process claims "arise from" the actions listed in § 1252(g), the court must look to the substance of these claims. Although Pedrote initially characterizes his injury as defendants' wrongfully including him in the gang database and sharing his false gang designation with immigration authorities, his due process claims require more. As discussed in further detail below, Pedrote maintains that he has stated a claim under the "stigma-plus doctrine." Under this doctrine, Pedrote must show (1) that a state actor publicly stigmatized him (the "stigma") and (2) that he suffered the loss of an additional liberty or property interest as a result (the "plus factor"). Pedrote delineates two plus factors—loss of actual freedom when he was taken into custody by ICE and lack of access to immigration relief given the false gang designation and publication to ICE. For purposes of the "arising from" analysis, the court thus considers both the initial stigmatizing act (*i.e.*, placing him in the gang database and sharing this information with ICE) as well as the alleged plus factors.

As the initial stigmatizing act certainly does not "arise from" any decision by the Attorney General to commence proceedings, adjudicate a case, or execute a removal order, the court moves swiftly to the two plus factors. With respect to the first plus factor, Pedrote was

8

presumably taken into custody by ICE before any proceeding commenced. The commencement of a removal proceeding generally occurs with the filing of a notice to appear (NTA) with the immigration court, which the court assumes occurred at some point after he was taken into custody. 8 C.F.R. § 1239.1. Further, nothing in the complaint indicates that any sort of proceeding had begun at the time of or before Pedrote was taken into custody. Section 1252(g) thus does not bar Pedrote's due process claim inasmuch as it is based on events that occurred before the issuance of an NTA. *See Khorrami* v. *Rolince*, 493 F. Supp. 2d 1061, 1069 (N.D. Ill. 2007) (finding that alleged liberty deprivation occurred before "the commencement of removal proceedings, thereby rendering § 1252(g) inapplicable"); s*ee also Humphries* v. *Various Fed. USINS Employees*, 164 F.3d 936, 944 (5th Cir. 1999) ("[W]e would defy logic by holding that a claim for relief somehow 'aris[es] from' decisions and actions accomplished only after the injury allegedly occurred.").

Defendants attempt to characterize the second plus factor as the denial of Pedrote's applications for DACA and the U Visa certification. The second plus factor, however, is not based on the denials of immigration relief. Rather, it is based on events allegedly occurring in 2011: CPD's incorrectly putting him in the gang database and then sharing his false gang designation with ICE, which in turn allegedly altered his right to seek immigration relief. Nothing in the complaint indicates that removal proceedings were commenced against Pedrote before CPD shared the information with ICE. Accordingly, 1252(g) is not applicable to the post-2011 conduct. *See Khorrami*, 493 F. Supp. 2d at 1069; *Humphries*, 164 F.3d at 944.

### III. Due Process Claims (Counts I–IV)

Having moved past the threshold issues, the court turns to the heart of the case. Pedrote contends he has stated a claim for deprivation of a protected liberty interest without adequate due process. He maintains that defendants violated his due process rights under the "stigma-plus

doctrine." Under this theory, to establish a protected liberty interest Pedrote must show "a loss of reputation ["stigma"] *plus* the deprivation of some other legal status or right ["plus"]." *Dupuy* v. *Samuels*, 397 F.3d 493, 513 (7th Cir. 2005). With regard to the stigma element, courts look to whether the government has publicly stigmatized an individual such that his "good name, reputation, honor, or integrity" has been called into question. *See Hannemann* v. *S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 753 (7th Cir. 2012) (quoting *Wisconsin* v. *Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507); *see also Dupuy*, 397 F.3d at 514 ("only defamatory statements that are disclosed or made public can stigmatize a person"). As to the plus element, the stigmatizing statement must "alter or eliminate 'a right or status previously recognized by state law.'" *Hannemann*, 673 F.3d at 753 (quoting *Paul* v. *Davis*, 424 U.S. 693, 711, 96 S. Ct. 1155 (1976). Although the stigma-plus doctrine was initially introduced in the employment context, courts have considered this test in other contexts, as well. *See id.*

There is little dispute that Pedrote meets the first prong of the analysis. Being put in the gang database carries with it the stigma of being a gang member, which is tied to a host of unfortunate implications such as involvement in criminal conduct. There is no question that being labeled a gang member harms one's reputation. Defendants also published Pedrote's gang-member designation when they shared the gang label with immigration officials. *See, e.g. Larry* v. *Lawler*, 605 F.3d 954, 958 (7th Cir. 1978) (finding sufficiently public the Civil Service Commission's sharing of plaintiff's stigmatizing label with federal agencies on a need to know basis); *Castillo* v. *County of Los Angeles*, 959 F. Supp. 2d 1255, 1261–62 (C.D. Cal. 2013) (finding plaintiff's inclusion in Child Welfare Services Case Management System sufficiently public where information in the database was not publicly available but was available to numerous in-state and out-of-state governmental entities and agencies).

The second prong, however, proves fatal to Pedrote's claim. As discussed above, Pedrote alleges two distinct plus factors: loss of actual freedom when he was taken into custody by ICE and lack of access to immigration relief given the false gang designation and publication to ICE. Pedrote argues that the first plus factor is met because "he was targeted by ICE for removal, taken into custody, detained for six months, and placed in deportation proceedings because Defendants shared [his] false gang designation with immigration authorities." (Dkt. 42 at 12.) While the legal basis for Pedrote's arrest has not been disclosed, the court infers that Pedrote was taken into custody and detained based on his undocumented status. Although the court has found cases where allegations of a false arrest and subsequent detention may potentially satisfy the plus factor, *see, e.g.*, *Carbone* v. *City of New Castle*, No. 2:15-CV-1175, 2016 WL 406291, at *5 (W.D. Pa. Feb. 3, 2016), there are no allegations in the complaint that the agents who arrested Pedrote lacked a legal basis to take him into custody. Nor has the court found a case where allegations of a valid arrest and detention (necessarily resulting in the loss of actual freedom) qualify as a plus factor. Thus, based on the allegations in the complaint, no legal right or status was altered or eliminated when Pedrote was taken into custody.

The second plus factor is similarly unavailing. Pedrote maintains that through legislation and executive action, the government has created the right for undocumented immigrants to seek discretionary forms of immigration relief, such as DACA and a U Visa. That much is true. He goes on to argue that "Defendants deprived him of that liberty interest when they eliminated his opportunity to be fairly considered for DACA on the same terms as other undocumented youth and instead saddled [Pedrote] and his application with the burden of a false gang designation." (Dkt. 42 at 13.) Under the "plus" prong, a change of legal status occurs where an individual "legally [cannot] do something that [he] could otherwise do." *Miller* v. *Cal.*, 355 F.3d 1172,

11

1178–79 (9th Cir. 2004) (discussing *Wisconsin* v. *Constantineau*, 400 U.S. 433, 91 S. Ct. 507 (1971)). Pedrote was not blocked from seeking discretionary forms of immigration relief. In fact, he sought such relief. Unfortunately for him, discretionary immigration relief is not an entitlement or a right. *See Darif* v. *Holder*, 739 F.3d 329, 335–36 (7th Cir. 2014) ("It is well established that aliens generally have due-process rights in proceedings to determine their removability. But this right does not extend to discretionary forms of relief from removal."). Denial of relief is within the discretion of the relevant agencies.[6] The inevitable conclusion follows that Pedrote has not been foreclosed from doing something he otherwise could do. Pedrote therefore has not satisfied the stigma-plus test and his due process claims must be dismissed.

Given that Pedrote's claim for failure to intervene (count III) and his *Monell* claim (count IV) rise or fall with his due process claims asserted in counts I and II, counts I–IV are dismissed.

## IV. State Law Claims (Counts V and VI)

Since no federal claim remains in the case, the court declines to exercise supplemental jurisdiction over Pedrote's state law claims (counts V and VI). *See* 28 U.S.C. 1367(c); *Szumny* v. *Am. Gen. Fin., Inc.*, 246 F.3d 1065, 1073 (7th Cir. 2001) (recognizing that the decision to retain supplemental state law claims is in the discretion of the district court). The court's decision not to exercise supplemental jurisdiction is particularly apt in this case given that the Illinois Civil

---

[6] Some courts have recognized the possibility that DACA may not be a discretionary form of relief. *See, e.g.*, *Texas* v. *United States*, 809 F.3d 134, 176 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (drawing on DACA and holding: "Reviewing for clear error, we conclude that the states have established a substantial likelihood that [the Deferred Action for Parents of Americans and Lawful Permanent Residents program] would not genuinely leave the agency and its employees free to exercise discretion."); *Torres* v. *United States Dep't. of Homeland Security*, No. 17cv1840, 2018 WL 1757668, at *9 (S.D. Cal. Apr. 12, 2018) (recognizing that a DACA recipient enjoys significant liberty and property interests once the "objective and non-discretionary criteria [expounded in the Napolitano Memo] are satisfied"). Given that Pedrote has not raised this issue and appears to concede that DACA is a discretionary form of immigration relief, the court need not explore it further.

Rights Act was expressly intended to provide a state law remedy that was identical to the federal disparate impact canon. *See Swan* v. *Bd. of Educ. of City of Chicago*, No. 13 C 3623, 2013 WL 4401439, at *19 n.11 (N.D. Ill. Aug. 15, 2013) ("Indeed, the ICRA was not intended to create new rights. It merely created a new venue in which plaintiffs could pursue in the State courts discrimination that had been available to them in the federal courts.") The court thus dismisses counts V and VI without prejudice.

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion to dismiss (dkt. 31) is granted. Counts I–IV are dismissed with prejudice. Counts V and VI are dismissed without prejudice. The case is terminated.

Date: May 22, 2018

U.S. District Judge Joan H. Lefkow